EXHIBIT 1

EXHIBIT 1

FILED
2026 MAR 03 09:00 AM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 26-2-07414-3 KNT

**SUPERIOR COURT
KING COUNTY, WASHINGTON**

| | |
|---|---|
| Maha Yousef Askar, in individual capacity, | NO: |
| Plaintiff, | |
| Vs. | COMPLAINT FOR DAMAGES |
| Providence Health & Services-Washington, a Washington Non-Profit Corporation, | |
| Defendants. | |

## I.   INTRODUCTION

Plaintiff, Maha Yousef Askar, ("Askar"), is an Arab, Palestinian Muslim who wears the hijab. She was employed as a Registered Nurse for Providence-Swedish Edmonds ("Swedish Edmonds") from October 2023 to February 2024. During her employment, she was subjected to repeated acts of discrimination and harassment based on her religion, national origin, race and retaliation. Despite her efforts to address these issues internally, she was punished for her complaints, and the hostile work environment persisted, ultimately forcing her to resign on threat of termination.

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

1

## II.    JURISDICTION AND VENUE

2.1.    Plaintiff Maha Askar was a resident of Edmonds, Washington at all relevant times herein.

2.2.    Providence-Swedish of Edmonds ("Swedish Edmonds") is organized under the laws of the State of Washington.

2.3.    This court has jurisdiction over this action pursuant to RCW 2.08.010.

2.4.    Venue is proper in King County, Washington because the Defendant's primary office is in 1801 Lind Ave SW, Renton, King County, Washington.

2.5.    Plaintiff filed a charge with the Equal Employment Opportunity Commission on September 13, 2024, and she was issued a right to sue letter on December 3, 2025.

## III.    FACTUAL ALLEGATIONS

3.1.    Plaintiff Maha Askar is an Arab, Palestinian, Muslim woman who wears the hijab as a religious head covering. Askar is a registered nurse with a stellar work history, she has more than 12 years' experience and she has completed more than thirty travel nursing assignments prior to her employment at Swedish Edmonds.

3.2.    In or around August 23, 2023, Askar interviewed for a day-shift position as a registered labor and delivery nurse at Swedish Edmonds. During her interview she informed Laura Allen and Sally Ault that she would use her rest and meal breaks to pray per her religious belief. Allen confirmed that Askar would be relieved by staff to pray, and that she would be assigned a locker to place her belongings.

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

3.3.    A few days later Allen texted Askar offering her the night position that would begin on September 25, 2023. Askar accepted the position even though it was not the day position she had applied for, and the day position remained open.

3.4.    Askar's first day was to begin on September 25, 2023, but her first day of employment was delayed without reason until October 16, 2023.

3.5.    On October 7, 2023, the Israel-Palestine conflict escalated. National civil rights organizations documented unprecedented spikes in workplace discrimination against Palestinian and Arab Americans immediately following October 7, 2023.[1]

3.6.    Plaintiff began her employment as a Registered Nurse at Swedish Edmonds on October 16, 2023.

3.7.    The racial and religious discrimination and hostile work environment began immediately, and numerous supervisors, physicians, and staff members perpetrated an ongoing campaign of harassment, discrimination and hostility.

3.8.    On October 28, 2023, Askar was in the nutrition room when nurse Joan Morrison entered the room, blocked the door, and began interrogating Askar about her ethnicity and nationality.  Morrison demanded to know where Askar was born, where her family lived and her nationality, and she blocked Askar's exit until she disclosed her Middle Eastern heritage. This incident was witnessed by numerous staff members.

3.9.    On multiple occasions during surgical procedures, nurses and physicians repeatedly and deliberately mispronounced Askar's name in a mocking manner. In one instance,

---

[1] Deepa Shivaram, Anti-Muslim Bias Skyrockets After Oct. 7th Hamas Attack on Israel, NPR (Apr. 2, 2024), *https://www.npr.org/2024/04/02/1242021356/anti-muslim-bias-skyrockets-after-oct-7th-hamasattack-*
    *on-israel*.

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

Darlene Marlowe, scrub technician, and Bruce Erhart, a physician, repeatedly mocked Askar's name during a surgical procedure, calling out "Hey you, Ma-who, Ma-what" and "MaHa, MaHa, MaHaHaHaHaHa" in a derisive, laughing tone.

3.10.    On November 1, 2023, Askar reported to Allen that Marlowe and Erhart mocked her name while performing surgery and in front of multiple witnesses therein humiliating her and ostracizing her from other staff members.

3.11.    Another time a xeroxed copy of Mike Tyson's face wearing a Christmas hat was placed near Plaintiff's personal belongings. This act was calculated to mock Plaintiff's religious beliefs and her faith's non-celebration of Christmas as Mike Tyson is a noted celebrity who converted to Islam.

3.12.    Furthermore, Defendants refused to assign Askar a locker, per hospital policy, so Askar was forced to leave her belongings out, and multiple times she would find them moved and rifled through. Askar repeatedly asked for a locker so her belongings wouldn't be searched through, but she was never assigned one.

3.13.    Hostility came from numerous staff members, physicians and leadership personnel who would engage in eye rolling, sneering, finger-pointing, walking away when Askar was discussing patient needs and deliberate refusal of eye contact.

3.14.    Staff members deliberately refused to assist Askar with job-related tasks, creating unsafe working conditions and sabotaging her ability to perform her duties, which Askar reported to numerous supervisors.

3.15.    Braden Allen, a Hospital Unit Coordinator and son of Laura Allen, refused to talk to Askar, and refused to help her. Mr. Allen refused to call another unit for supplies needed by Askar to treat her fainting patient. During another incident, Mr. Allen refused to assist Askar

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

with patient discharge, and he refused to take any administrative items so she could escort her patient out. In another instance Mr. Allen paged Askar 10-15 times falsely reporting her patient was in need, when Askar checked on her patient, she denied needing assistance.

3.16.    Hospital Unit Coordinator Danielle Curtis' hostility began when Askar met her in mid-November, 2023. Curtis refused to work with Askar collaboratively, refusing to look at her, respond to questions, or requests, Curtis would walk away while Askar was speaking, she rolled her eyes and turned away when Askar requested assistance with making copies, with Curtis falsely stating she did not know how to use the copy machine. On another incident, Curtis refused to assist Askar with obtaining a critical patient's signature prior to an urgent C-section.

3.17.    Curtis oversaw locker assignments for employees' personal belongings, and when Askar requested a locker, Curtis lied to Askar telling her that no lockers were available. Curtis refused to assign Askar a locker even when one was available, and even after Askar requested it multiple times. Several staff members occupied more than one locker, but Askar was never assigned one.

3.18.    Askar was forced to leave her belongings in public spaces, or near her workstation. Multiple times Askar returned to her workstation to find her belongings were rifled through, including an application with personal identification was open for anyone to see. Her bag was left open, and her wallet and keys were visible. Askar asked Curtis why she moved her belongings, Curtis replied, as she was walking away from Askar, that she needed to put a file folder there, even when there were multiple other cabinets Curtis could have used.

3.19.    Patricia Janjary, a charge nurse and Askar's supervisor, was so condescending in her refusal to assist Askar in front of a patient that the patient commented on Janjary's lack of

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

professionalism and quality of care. Askar reported these incidents to Allen and supervisory staff, but nothing was done to stop the hostility.

3.20.    On numerous occasions, physicians refused to speak to Askar or work collaboratively with her, therein creating unsafe working conditions and violating standards of care for patients.

3.21.    On or around November 10, 2023, Askar was assigned as Erhart's patient's primary nurse, but he refused to give Askar medical orders, instead he attempted to give the medical orders to two different nurses on two different attempts. When both the nurses informed Erhart that Askar was his patient's primary nurse, he still refused to give her the medical orders for the critical care of his patient.  When Askar tried to confirm the medical orders with Erhart, he turned and walked away from her. Shortly after, Askar was sent home early by Jillian Scott a charge nurse and Askar's supervisor, because Dr. Erhart did not want to work with her.

3.22.    November 30, 2023, Dr. Randolph Bourne refused to acknowledge Askar's nursing report and concern for his critical unstable patient. Ignoring her report and her concerns, he yelled at her in front of the entire unit staff. However, when Tony Kim, Charge Nurse and Makenna Caffery, Triage Nurse, approached him after with the same report, he immediately listened to them and changed the orders.

3.23.    On December 9, 2023, Erhart again yelled at Askar in the operating room when she was following hospital policy to wait for all team members for a safety pause. Askar reported it to Laura Duam, the charge nurse and Askar's supervisor, and she laughed at Askar and said, "that's not my problem." Askar then reported the incident to Laura Allen, the unit manager, who laughed and told her to fill out an incident report.

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

3.24. Marlowe and Duam relentlessly perpetrated a hostile work environment, discrimination and retaliation.

3.25. Marlowe perpetrated ongoing harassment, discrimination and hostility towards Askar. Marlowe slammed Askar's chair with a medical supplies cart and walked away. Marlowe purposefully and repeatedly interrupted Askar's conversations with other staff members and yelled at staff members who were speaking to her, reducing her to tears in the workplace. In one instance, while Askar was in discussion with another nurse, Rachel Capetillo, Marlowe began yelling at Capetillo demanding she leave the unit with her, until Capetillo told Askar that she had to stop the conversation or Marlowe would not stop yelling. In another instance Marlowe slammed a metal cart with medical supplies into Askar's chair, and later Marlowe slammed the same cart between the elevator doors while Askar was in the elevator. When Askar greeted Marlowe in the elevator after she slammed the cart between the doors, Marlowe refused to acknowledge her after multiple prompts.

3.26. Allen, the Unit Manager, refused to stop the harassment even after numerous verbal and written complaints.

3.27. Askar's Islamic faith requires her to pray five (5) times a day, and typically two or three prayer times fall within a shift depending on the season and time, and the prayers take between ten to fifteen minutes (10-15) minutes.

3.28. Swedish Edmonds employ break nurses, staff specifically to provide breaks when requested, to ensure employees receive breaks. During Askar's interview she specifically asked how breaks were implemented to ensure she could take prayer breaks. Allen and Ault assured Askar that she could take prayer breaks as there were break nurses, and policies to ensure staff

7

received breaks. During her employment, in preparation for taking prayer breaks, Askar would ensure her patients' needs were met, and she would not be needed during the 15 minutes.

3.29. Duam intentionally prevented Askar from taking rest and meal breaks and utilizing these breaks for prayer. On multiple occasions Duam assigned Askar new patients right before her breaktime, therein preventing Askar from taking a break and being able to pray. On multiple occasions Duam would tell Askar that she had to take her break a certain time that did not align with her prayer schedule, or she must forfeit her break. Duam refused to utilize the break nurse who was scheduled for the purpose of giving staff breaks at their desired time. In late November 2023, Askar reported to Ault that she was not getting her breaks at the necessary times to take prayer, but nothing was done.

3.30. On or around November 27th, 2023, Askar sought out Kalea Brooks, who was the break nurse on shift for a break, Askar verified that Brooks was not breaking other staff members, or that she had a patient assignment that would preclude her from providing Askar a break. Askar found Brooks sleeping in the doctors' area and requested a break, which Brooks was hesitant to provide. When Askar was walking away she heard Duam questioning why Brooks agreed to give Askar a break, and that Brooks should have consulted with Duam first so she could dictate when Askar takes her break.

3.31. On or around, January 18, 2024, Askar was approached by Caffery, who was the resource/break nurse, and Duam was the charge nurse, and Caffery told Askar that she needed to combine her three fifteen (15) minute breaks and the thirty (30) minute break into one break. When Askar objected because she needed to pray during her morning break, Caffery demanded Askar take all her breaks at once per the orders of Duam.

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

3.32.    On January 23, 2024, Megan Slawson, approached Askar and informed her that Duam instructed her to provide a break to Askar. Askar objected and said she needed her morning break for prayer, which Slawson refused. Askar confronted Duam about needing a morning break for prayer, and Duam told her to take a break immediately or forfeit it. Later, Duam refused to discuss a new patient case with Askar. Duam sent another nurse to discuss the new patient as an attempt to punish Askar for requesting her break.

3.33.    Duam also called Askar the devil in front of staff members, frequently interrupted Askar when she was communicating with other staff members in attempts to intimidate her and purposefully isolate her from her peers.

3.34.    Allen never took Askar's complaints seriously, and she was openly hostile, discriminatory and retaliatory towards Askar when she tried to make complaints about the hostility. When Askar requested a day shift to remedy the harassment, Allen refused.

3.35.    When Askar interviewed she informed Allen and Ault that she would need Friday days off as a religious accommodation because it was her holy day.

3.36.    Allen perpetrated religious discrimination repeatedly when she would schedule mandatory meetings with Askar when she was not scheduled, requiring her to come into work, during prayer time, and on her off days.

3.37.    On January 5th, 2024, Allen called Askar into her office for an unscheduled reprimand meeting where she falsely accused Askar of not calling into work on December 26, 2024, which was pretext for writing Askar up. Askar quickly provided proof that she received a phone call from the charge nurse's unit mobile, and her shift was canceled for the night. Allen said she would investigate, but that was never done.

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

3.38.    During that meeting Askar became emotional, and explained to Allen that the allegations were false, and that she was additionally upset by the events in Palestine where her family lives. Allen screamed at Askar, "You are an American Maha! You came from Hawaii." Allen yelled loud enough to draw the attention of numerous staff members outside of the closed-door office, and reducing Askar to tears. Askar responded that she was a Palestinian from Texas, and she was impacted by the conflict. Allen rolled her eyes and shrugged her shoulders.

3.39.    During that same meeting, Askar again complained to Allen that she was being mistreated by multiple staff members who refused to assist her with basic requirements of the job, and coworkers refused to speak to her, and numerous staff members were refusing to relieve Askar so she could take her prayer breaks when she requested them and needed them. After reporting Curtis' behavior Allen said she was not surprised by Curtis' actions and stated that she would not reprimand Curtis. Allen stated that she knew everything that happened in the unit, indicating that she was knowledgeable about the hostility that Askar experienced.

3.40.    On January 10, 2024, Allen summoned Askar to her office again for another unscheduled reprimand meeting, where Allen presented Askar with a pretextual reprimand and to notify Askar her probation was being extended.

3.41.    The reprimand was for December 26th, 2023, when Askar was called by the charge nurse and she confirmed her shift was canceled, a situation they previously discussed, and Allen said she would investigate. Instead of verifying with staff, Allen used it to pretextually discipline Askar by presenting her with probationary extension documents several days prior to her probationary release and becoming a permanent staff member of Providence-Swedish Medical facility.

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

3.42.    The Collective Bargaining Agreement requires that staff have notice of all reprimand meetings so they can bring a witness or union delegate. Askar was never given notice of Allen's reprimand meetings.

3.43.    On or around January 13, 2024, Askar informed Ronco Wong, the union representative, that she was experiencing ongoing harassment, discrimination, and hostility from Allen and that her probationary period was being extended without cause. Wong explained to Askar that "Laura has been in hot waters before," and he could not help until Askar was off probation.

3.44.    On or around January 25, 2024, Askar emailed Laura Allen, Danielle Curtis and Braden Allen reporting the hostile work environment and staffs' refusal to assist her with patient care, and that she was never assigned a locker and staff had gone through her belongings. She never received a response.

3.45.    On or around January 30, 2024, Askar reported to Care Relations about the ongoing harassment and retaliation she experienced. That same day, she emailed Dana Kyles, the Unit Director, reporting the ongoing harassment and retaliation, and Kyles said she forwarded the email to Elina Lazo, the Chief Nursing Officer. Allen then emailed Askar demanding she attend a mandatory meeting with Human Resources on Friday at 7:30 am, which conflicted with her prayer time. Askar, again called Care Relations, to report that Allen refuses to provide religious accommodations for meetings.

3.46.    On or around February 4, 2024, Askar was notified that her shift was cancelled for being overstaffed. This was after Allen had transferred two-night nurses to day shift because of over staffing. Also, Askar had requested to be transferred to day shift to remedy the harassment and she was denied.

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

3.47.   Then on or around February 5th, 2024, Askar went to work and discovered a new employee, Mackenzie Frost, was a new hire who was being trained as a triage nurse. Previously, Allen told Askar she could not train to be a triage nurse because she was on probation, however Frost was hired and immediately in training for triage.  Askar was more qualified than Frost, and she had more seniority than Frost.

3.48.   Askar is a very experienced triage nurse and more experienced than many nurses on the ward, which Allen knew about prior to hiring her. Typically, the more experienced labor and delivery nurse is assigned as the triage nurse, and Askar informed Allen that the triage nurse position would accommodate her prayer schedule, so she was hopeful to be trained in triage when her probation ended on or around January 14, 2024. Instead, Askar's probation was extended, and Frost was trained as triage even though she was less experience and had less seniority.

3.49.   On or around February 7, 2024, Askar met with Laura Allen, the unit manager, Laura Anna, her union delegate, and Lorrie Ward, a Providence-Swedish HR specialist, in a virtual meeting. During the meeting Allen and Ward both had their cameras off. Allen falsely accused Askar that numerous staff members made reports against her, and that staff members feared her because she spoke a different language. Askar refuted the allegations and reiterated the hostile work environment and retaliation she experienced. After the meeting Anna encouraged Askar to resign stating, "Laura will continue to harass and micromanager you until she can find a reason to terminate you, and that will cause you to be ineligible to work for Providence anywhere in the US." Askar was forced to resign after her union representative warned her that management planned to fire her. These actions created an intolerable work environment, making it nearly impossible for her to perform her duties safely and effectively.

12

3.50.   On or around February 8, 2024, Askar was constructively discharged from her position. She submitted a resignation letter with her final day as February 22, 2024, but Allen emailed her demanding Askar not return to the hospital, and her final day would be February 8th, 2024. Lazo then emailed Askar stating, "I'm sorry this situation drove you to resign from your position."

3.51.   On March 11, 2024, Askar was contacted by a Care Relations Specialist who informed Askar that an investigation was complete, but the information was confidential.

3.52.   The Defendants failed to compensate Askar for her first six weeks of her employment as they sent the paychecks to Hawaii, at her previous address, but Askar was working and living in Washington.

3.53.   When Askar brought this to Swedish Edmonds attention it took weeks to remedy, and she was never provided a full accounting of her shifts and her compensation. Askar believes she was not paid for multiple shifts.

3.54.   Also, Defendants required Askar to have meetings with Ault and Allen without compensation as she had clocked out of work and on her way out of the hospital when she was told she must go to a meeting. She was never compensated for the meetings.

3.55.   Askar was forced to miss her rest and meal breaks on multiple occasions and she was unable to pray during her designated prayer times.

## I.   FIRST CAUSE OF ACTION
**Violation of Washington Law Against Discrimination,
Chapter 49.60 RCW, for Race Discrimination**

3.56.   Plaintiff realleges above paragraphs 1.1 though 3.55.

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

3.57.    The acts and conduct of defendant as alleged herein constitute race discrimination by denying her a day shift, extending her probationary period, and forcing her to resign because she was an Arab American.

3.58.    As a result of the unlawful acts of defendant, plaintiff has been injured in an amount to be proven at trial; and is entitled to recover all damages sustained including but not limited to past and future, actual and compensatory, economic and non-economic, and special and general damages.

### IV.    SECOND CAUSE OF ACTION
**Violation of Title VII of the Civil Rights Act Chapter 42 U.S.C. § 1981(a),
Race and National Origin Discrimination**

4.1.    Plaintiff realleges above paragraphs 1.1 though 3.55.

4.2.    The acts and conduct of defendant as alleged herein constitute race and national origin discrimination as described above including, by denying her a day shift, extending her probationary period, and forcing her to resign because she was an Arab American.

4.3.    As a result of the unlawful acts of defendant, plaintiff has been injured in an amount to be proven at trial; and is entitled to recover all damages sustained including but not limited to past and future, actual and compensatory, economic and non-economic, and special and general damages.

### V.    THIRD CAUSE OF ACTION
**Violation of Washington Law Against Discrimination,
Chapter 49.60 RCW, for Religious Discrimination Failure to Accommodate**

5.1.    Plaintiff realleges above paragraphs 1.1 though 3.55.

5.2.    The acts and conduct of defendant as alleged herein constitute failure to accommodate the Plaintiff's religious accommodations by not allowing her to pray at specific prayer times, and planning and mandating the Plaintiff to attend meetings during her holy day.

14

5.3.    As a result of the unlawful acts of defendant, plaintiff has been injured in an amount to be proven at trial; and is entitled to recover all damages sustained including but not limited to past and future, actual and compensatory, economic and non-economic, and special and general damages.

## VI.    FOURTH CAUSE OF ACTION
### Violation of Title VII of the Civil Rights Act Chapter 42 U.S.C. § 2000e-2, Religious Discrimination for Failure to Accommodate

6.1.    Plaintiff realleges above paragraphs 1.1 though 3.55.

6.2.    The acts and conduct of defendant as alleged herein constitute failure to accommodate the Plaintiff's religious accommodations by not allowing her to pray at specific prayer times, and planning and mandating the Plaintiff to attend meetings during her holy day.

6.3.    As a result of the unlawful acts of defendant, plaintiff has been injured in an amount to be proven at trial; and is entitled to recover all damages sustained including but not limited to past and future, actual and compensatory, economic and non-economic, and special and general damages.

## VII.    FIFTH CAUSE OF ACTION
### Violation of Washington Law Against Discrimination, Chapter 49.60 RCW, for National Origin Discrimination

7.1.    Plaintiff realleges above paragraphs 1.1 though 3.55.

7.2.    The acts and conduct of defendant as alleged herein constitute discrimination against the Plaintiff based on her Palestinian national origin. Defendants failed to stop harassment, and discrimination based on the Plaintiff's national origin.

7.3.    As a result of the unlawful acts of defendant, plaintiff has been injured in an amount to be proven at trial; and is entitled to recover all damages sustained including but not

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

limited to past and future, actual and compensatory, economic and non-economic, and special and general damages.

### VIII.      SIXTH CAUSE OF ACTION
**Violation of Title VII of the Civil Rights Act Chapter 42 U.S.C. § 1981, Hostile Work Environment**

8.1.    Plaintiff realleges above paragraphs 1.1 though 3.55.

8.2.    The acts and conduct of defendant as alleged herein constitute a hostile work environment based on the Plaintiff's race and national origin. The Defendants knew the Plaintiff was experiencing harassment based on her religious beliefs and they failed to stop the harassment.

8.3.    As a result of the unlawful acts of defendant, plaintiff has been injured in an amount to be proven at trial; and is entitled to recover all damages sustained including but not limited to past and future, actual and compensatory, economic and non-economic, and special and general damages.

### IX.      SEVENTH CAUSE OF ACTION
**Violation of Washington Law Against Discrimination, Chapter 49.60 RCW, for Hostile Work Environment**

9.1.    Plaintiff realleges above paragraphs 1.1 though 3.55.

9.2.    The acts and conduct of defendant as alleged herein constitute a hostile work environment based on the Plaintiff's protected status. The Defendants knew the Plaintiff was experiencing harassment based on her protected status and they failed to stop the harassment.

9.3.    As a result of the unlawful acts of defendant, plaintiff has been injured in an amount to be proven at trial; and is entitled to recover all damages sustained including but not limited to past and future, actual and compensatory, economic and non-economic, and special and general damages.

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

**X.    EIGHTH CAUSE OF ACTION**
**Violation of Washington Law Against Discrimination,**
**Wrongful Termination - Constructive Discharge**

10.1.    Plaintiff realleges above paragraphs 1.1 though 3.55.

10.2.    The acts and conduct of defendant as alleged herein constitute wrongful termination as the Defendant's actions caused an end to Plaintiff's employment, constituting wrongful termination in violation of public policy. The ** Plaintiff was informed she needed to quit, or she would continue to face harassment and discrimination, leading to termination and ineligibility to work for Providence Medical Corporation.

10.3.    As a result of the unlawful acts of defendant, plaintiff has been injured in an amount to be proven at trial; and is entitled to recover all damages sustained including but not limited to past and future, actual and compensatory, economic and non-economic, and special and general damages.

**XI.    NINTH CAUSE OF ACTION**
**Violation of the Washington Industrial Welfare Act and Violation of the**
**Washington Minimum Wage Act Chapter 49.12 RCW, Failure to Provide Meal**
**Period and Failure to Compensate for Violations of Meal Period**

11.1.    Plaintiff realleges above paragraphs 1.1 though 3.55.

11.2.    The Washington Industrial Welfare Act, RCW 49.12, and its implementing regulation, WAC 296-126-092, require employers to provide a meal period of not less than thirty minutes, on the employer's time, for each five hours of working time.

11.3.    Employees have an implied cause of action for violations of RCW 49.12 to protect them from conditions of labor that have a pernicious effect on their health. *Wingert v. Yellow Freight Systems, Inc.*, 146 Wn.2d 841, 850 (2002).

17

11.4.    A meal period violation is a wage violation with employees entitled to thirty minutes of additional compensation for each instance they are required to work more than five consecutive hours without a compliant meal period. *Hill v. Garda CL Nw., Inc.*, 191 Wn.2d 553, 560 (2018), citing *Hill v. Garda CL Nw., Inc.*, 198 Wn. App 326, 361 (2017).

11.5.    Defendant violated the Minimum Wage Act when it failed to compensate Plaintiff for thirty minutes of work for each a meal period in a duration of thirty minutes commencing between the second and fifth hour from the start of their shift, or when it required them to work greater than five consecutive hours without or between meal periods.

11.6.    As a result of the unlawful acts of defendant, plaintiff has been injured in an amount to be proven at trial; and is entitled to recover all damages sustained including but not limited to past and future, actual and compensatory, economic and non-economic, and special and general damages.

**XII.    TENTH CAUSE OF ACTION**
**Violation of the Washington Industrial Welfare Act and Violation of the Washington Minimum Wage Act Chapter 49.12 RCW, Failure to Provide Rest Period and Failure to Compensate for Missed Rest Periods**

12.1.    Plaintiff realleges above paragraphs 1.1 though 3.55.

12.2.    The Washington Industrial Welfare Act, RCW 49.12, and its implementing regulation, WAC 296-126-092, require employers to provide a rest period of not less than ten minutes, on the employer's time, for each four hours of working time.

12.3.    Employees have an implied cause of action for violations of RCW 49.12 to protect them from conditions of labor that have a pernicious effect on their health. *Wingert v. Yellow Freight Systems, Inc.*, 146 Wn.2d 841, 850 (2002).

18

12.4.   A rest period violation is a wage violation with employees entitled to ten minutes of additional compensation for each instance they are required or allowed to work longer than three consecutive hours without a rest break. *Id* at 849.

12.5.   Defendant violated the Industrial Welfare Act and its implementing regulation by failing to ensure Plaintiff received a ten-minute paid rest period for every four hours worked and by failing to keep records of the occurrence, time and duration of rest periods taken, by failing to implement a process for Plaintiffs and members of the putative class to report missed or otherwise noncompliant rest periods and by creating work schedules, staffing levels and conditions of work that discouraged paid rest periods.

12.6.   Defendant violated the Minimum Wage Act when it failed to compensate Plaintiff for an additional ten minutes of work for each instance it required them to work greater than three consecutive hours without a rest period, provided a rest period in a duration of less than ten minutes, or did not provide a rest period of at least ten minutes in duration for each four hours worked.

12.7.   Defendant violated the Industrial Welfare Act, the Minimum Wage Act when they failed to compensate Plaintiff for rest periods separately and in addition to piecework, commission, and/or other productivity-based wages.

12.8.   As a result of the unlawful acts of defendant, plaintiff has been injured in an amount to be proven at trial; and is entitled to recover all damages sustained including but not limited to past and future, actual and compensatory, economic and non-economic, and special and general damages.

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

## XIII.    ELEVENTH CAUSE OF ACTION
### Violation of the Washington Wage Rebate Act
### Willful Withholding of Wages in

13.1.    Plaintiff realleges above paragraphs 1.1 though 3.55.

13.2.    By the foregoing, Defendant's actions constitute willful withholding of wages due in violation of RCW 49.52.050 and 070.

13.3.    As a result of the unlawful acts of defendant, plaintiff has been injured in an amount to be proven at trial; and is entitled to recover all damages sustained including but not limited to past and future, actual and compensatory, economic and non-economic, and special and general damages.

## XIV.    REQUEST FOR RELIEF

14.1.    Awarding Plaintiff back pay and lost wages, loss of career trajectory and income potential, and lost benefits to be proven at trial;

14.2.     Awarding Plaintiff general damages for loss of enjoyment of life, pain and suffering, mental anguish, emotional distress, injury to reputation, and humiliation;

14.3.    Awarding Plaintiff reasonable attorney's fees and costs;

14.4.    Awarding Plaintiff pre-judgement interest in an amount to be proven at trial;

14.5.    Awarding Plaintiff post-judgement interest in an amount to be proven at trial;

14.6.    Awarding Plaintiff an offset for the adverse tax consequences of the judgment;

14.7.    Declaratory and injunctive relief;

14.8.    Leave to amend the Complaint to conform to the evidence presented at trial; and

14.9.    Further and additional relief that the court deems just and equitable.

20

DATED this 2nd day of March, 2026.

MX Law, PLLC

_s/Morgan Mentzer_
Morgan Mentzer, WSBA No. 47483
710 Pacific Ave, #8
Tacoma, WA 98402
(253) 693-0388
morgan@mxlaw.net
_Attorney for Plaintiff_

FILED
2026 MAR 03 09:00 AM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 26-2-07414-3 KNT

**SUPERIOR COURT**
**KING COUNTY, WASHINGTON**

Maha Yousef Askar, in individual capacity,

NO:

Plaintiff,

Vs.

COMPLAINT FOR DAMAGES

Providence Health & Services-Washington,
a Washington Non-Profit Corporation,

Defendants.

## I.      INTRODUCTION

Plaintiff, Maha Yousef Askar, ("Askar"), is an Arab, Palestinian Muslim who wears the hijab. She was employed as a Registered Nurse for Providence-Swedish Edmonds ("Swedish Edmonds") from October 2023 to February 2024. During her employment, she was subjected to repeated acts of discrimination and harassment based on her religion, national origin, race and retaliation. Despite her efforts to address these issues internally, she was punished for her complaints, and the hostile work environment persisted, ultimately forcing her to resign on threat of termination.

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

1

## II.    JURISDICTION AND VENUE

2.1.    Plaintiff Maha Askar was a resident of Edmonds, Washington at all relevant times herein.

2.2.    Providence-Swedish of Edmonds ("Swedish Edmonds") is organized under the laws of the State of Washington.

2.3.    This court has jurisdiction over this action pursuant to RCW 2.08.010.

2.4.    Venue is proper in King County, Washington because the Defendant's primary office is in 1801 Lind Ave SW, Renton, King County, Washington.

2.5.    Plaintiff filed a charge with the Equal Employment Opportunity Commission on September 13, 2024, and she was issued a right to sue letter on December 3, 2025.

## III.    FACTUAL ALLEGATIONS

3.1.    Plaintiff Maha Askar is an Arab, Palestinian, Muslim woman who wears the hijab as a religious head covering. Askar is a registered nurse with a stellar work history, she has more than 12 years' experience and she has completed more than thirty travel nursing assignments prior to her employment at Swedish Edmonds.

3.2.    In or around August 23, 2023, Askar interviewed for a day-shift position as a registered labor and delivery nurse at Swedish Edmonds. During her interview she informed Laura Allen and Sally Ault that she would use her rest and meal breaks to pray per her religious belief. Allen confirmed that Askar would be relieved by staff to pray, and that she would be assigned a locker to place her belongings.

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

2

3.3.    A few days later Allen texted Askar offering her the night position that would begin on September 25, 2023. Askar accepted the position even though it was not the day position she had applied for, and the day position remained open.

3.4.    Askar's first day was to begin on September 25, 2023, but her first day of employment was delayed without reason until October 16, 2023.

3.5.    On October 7, 2023, the Israel-Palestine conflict escalated. National civil rights organizations documented unprecedented spikes in workplace discrimination against Palestinian and Arab Americans immediately following October 7, 2023.[1]

3.6.    Plaintiff began her employment as a Registered Nurse at Swedish Edmonds on October 16, 2023.

3.7.    The racial and religious discrimination and hostile work environment began immediately, and numerous supervisors, physicians, and staff members perpetrated an ongoing campaign of harassment, discrimination and hostility.

3.8.    On October 28, 2023, Askar was in the nutrition room when nurse Joan Morrison entered the room, blocked the door, and began interrogating Askar about her ethnicity and nationality.  Morrison demanded to know where Askar was born, where her family lived and her nationality, and she blocked Askar's exit until she disclosed her Middle Eastern heritage. This incident was witnessed by numerous staff members.

3.9.    On multiple occasions during surgical procedures, nurses and physicians repeatedly and deliberately mispronounced Askar's name in a mocking manner. In one instance,

---

[1] Deepa Shivaram, Anti-Muslim Bias Skyrockets After Oct. 7th Hamas Attack on Israel, NPR (Apr. 2, 2024), *https://www.npr.org/2024/04/02/1242021356/anti-muslim-bias-skyrockets-after-oct-7th-hamasattack-*
    *on-israel*.

Darlene Marlowe, scrub technician, and Bruce Erhart, a physician, repeatedly mocked Askar's name during a surgical procedure, calling out "Hey you, Ma-who, Ma-what" and "MaHa, MaHa, MaHaHaHaHaHa" in a derisive, laughing tone.

3.10.    On November 1, 2023, Askar reported to Allen that Marlowe and Erhart mocked her name while performing surgery and in front of multiple witnesses therein humiliating her and ostracizing her from other staff members.

3.11.    Another time a xeroxed copy of Mike Tyson's face wearing a Christmas hat was placed near Plaintiff's personal belongings. This act was calculated to mock Plaintiff's religious beliefs and her faith's non-celebration of Christmas as Mike Tyson is a noted celebrity who converted to Islam.

3.12.    Furthermore, Defendants refused to assign Askar a locker, per hospital policy, so Askar was forced to leave her belongings out, and multiple times she would find them moved and rifled through. Askar repeatedly asked for a locker so her belongings wouldn't be searched through, but she was never assigned one.

3.13.    Hostility came from numerous staff members, physicians and leadership personnel who would engage in eye rolling, sneering, finger-pointing, walking away when Askar was discussing patient needs and deliberate refusal of eye contact.

3.14.    Staff members deliberately refused to assist Askar with job-related tasks, creating unsafe working conditions and sabotaging her ability to perform her duties, which Askar reported to numerous supervisors.

3.15.    Braden Allen, a Hospital Unit Coordinator and son of Laura Allen, refused to talk to Askar, and refused to help her. Mr. Allen refused to call another unit for supplies needed by Askar to treat her fainting patient. During another incident, Mr. Allen refused to assist Askar

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

with patient discharge, and he refused to take any administrative items so she could escort her patient out. In another instance Mr. Allen paged Askar 10-15 times falsely reporting her patient was in need, when Askar checked on her patient, she denied needing assistance.

3.16.    Hospital Unit Coordinator Danielle Curtis' hostility began when Askar met her in mid-November, 2023. Curtis refused to work with Askar collaboratively, refusing to look at her, respond to questions, or requests, Curtis would walk away while Askar was speaking, she rolled her eyes and turned away when Askar requested assistance with making copies, with Curtis falsely stating she did not know how to use the copy machine. On another incident, Curtis refused to assist Askar with obtaining a critical patient's signature prior to an urgent C-section.

3.17.    Curtis oversaw locker assignments for employees' personal belongings, and when Askar requested a locker, Curtis lied to Askar telling her that no lockers were available. Curtis refused to assign Askar a locker even when one was available, and even after Askar requested it multiple times. Several staff members occupied more than one locker, but Askar was never assigned one.

3.18.    Askar was forced to leave her belongings in public spaces, or near her workstation. Multiple times Askar returned to her workstation to find her belongings were rifled through, including an application with personal identification was open for anyone to see. Her bag was left open, and her wallet and keys were visible. Askar asked Curtis why she moved her belongings, Curtis replied, as she was walking away from Askar, that she needed to put a file folder there, even when there were multiple other cabinets Curtis could have used.

3.19.    Patricia Janjary, a charge nurse and Askar's supervisor, was so condescending in her refusal to assist Askar in front of a patient that the patient commented on Janjary's lack of

professionalism and quality of care. Askar reported these incidents to Allen and supervisory staff, but nothing was done to stop the hostility.

3.20.    On numerous occasions, physicians refused to speak to Askar or work collaboratively with her, therein creating unsafe working conditions and violating standards of care for patients.

3.21.    On or around November 10, 2023, Askar was assigned as Erhart's patient's primary nurse, but he refused to give Askar medical orders, instead he attempted to give the medical orders to two different nurses on two different attempts. When both the nurses informed Erhart that Askar was his patient's primary nurse, he still refused to give her the medical orders for the critical care of his patient.  When Askar tried to confirm the medical orders with Erhart, he turned and walked away from her. Shortly after, Askar was sent home early by Jillian Scott a charge nurse and Askar's supervisor, because Dr. Erhart did not want to work with her.

3.22.    November 30, 2023, Dr. Randolph Bourne refused to acknowledge Askar's nursing report and concern for his critical unstable patient. Ignoring her report and her concerns, he yelled at her in front of the entire unit staff. However, when Tony Kim, Charge Nurse and Makenna Caffery, Triage Nurse, approached him after with the same report, he immediately listened to them and changed the orders.

3.23.    On December 9, 2023, Erhart again yelled at Askar in the operating room when she was following hospital policy to wait for all team members for a safety pause. Askar reported it to Laura Duam, the charge nurse and Askar's supervisor, and she laughed at Askar and said, "that's not my problem." Askar then reported the incident to Laura Allen, the unit manager, who laughed and told her to fill out an incident report.

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

3.24.    Marlowe and Duam relentlessly perpetrated a hostile work environment, discrimination and retaliation.

3.25.    Marlowe perpetrated ongoing harassment, discrimination and hostility towards Askar.  Marlowe slammed Askar's chair with a medical supplies cart and walked away. Marlowe purposefully and repeatedly interrupted Askar's conversations with other staff members and yelled at staff members who were speaking to her, reducing her to tears in the workplace. In one instance, while Askar was in discussion with another nurse, Rachel Capetillo, Marlowe began yelling at Capetillo demanding she leave the unit with her, until Capetillo told Askar that she had to stop the conversation or Marlowe would not stop yelling. In another instance Marlowe slammed a metal cart with medical supplies into Askar's chair, and later Marlowe slammed the same cart between the elevator doors while Askar was in the elevator. When Askar greeted Marlowe in the elevator after she slammed the cart between the doors, Marlowe refused to acknowledge her after multiple prompts.

3.26.    Allen, the Unit Manager, refused to stop the harassment even after numerous verbal and written complaints.

3.27.    Askar's Islamic faith requires her to pray five (5) times a day, and typically two or three prayer times fall within a shift depending on the season and time, and the prayers take between ten to fifteen minutes (10-15) minutes.

3.28.    Swedish Edmonds employ break nurses, staff specifically to provide breaks when requested, to ensure employees receive breaks. During Askar's interview she specifically asked how breaks were implemented to ensure she could take prayer breaks. Allen and Ault assured Askar that she could take prayer breaks as there were break nurses, and policies to ensure staff

7

received breaks. During her employment, in preparation for taking prayer breaks, Askar would ensure her patients' needs were met, and she would not be needed during the 15 minutes.

3.29.    Duam intentionally prevented Askar from taking rest and meal breaks and utilizing these breaks for prayer. On multiple occasions Duam assigned Askar new patients right before her breaktime, therein preventing Askar from taking a break and being able to pray. On multiple occasions Duam would tell Askar that she had to take her break a certain time that did not align with her prayer schedule, or she must forfeit her break. Duam refused to utilize the break nurse who was scheduled for the purpose of giving staff breaks at their desired time. In late November 2023, Askar reported to Ault that she was not getting her breaks at the necessary times to take prayer, but nothing was done.

3.30.    On or around November 27th, 2023, Askar sought out Kalea Brooks, who was the break nurse on shift for a break, Askar verified that Brooks was not breaking other staff members, or that she had a patient assignment that would preclude her from providing Askar a break. Askar found Brooks sleeping in the doctors' area and requested a break, which Brooks was hesitant to provide. When Askar was walking away she heard Duam questioning why Brooks agreed to give Askar a break, and that Brooks should have consulted with Duam first so she could dictate when Askar takes her break.

3.31.    On or around, January 18, 2024, Askar was approached by Caffery, who was the resource/break nurse, and Duam was the charge nurse, and Caffery told Askar that she needed to combine her three fifteen (15) minute breaks and the thirty (30) minute break into one break. When Askar objected because she needed to pray during her morning break, Caffery demanded Askar take all her breaks at once per the orders of Duam.

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

8

3.32.    On January 23, 2024, Megan Slawson, approached Askar and informed her that Duam instructed her to provide a break to Askar. Askar objected and said she needed her morning break for prayer, which Slawson refused. Askar confronted Duam about needing a morning break for prayer, and Duam told her to take a break immediately or forfeit it. Later, Duam refused to discuss a new patient case with Askar. Duam sent another nurse to discuss the new patient as an attempt to punish Askar for requesting her break.

3.33.    Duam also called Askar the devil in front of staff members, frequently interrupted Askar when she was communicating with other staff members in attempts to intimidate her and purposefully isolate her from her peers.

3.34.    Allen never took Askar's complaints seriously, and she was openly hostile, discriminatory and retaliatory towards Askar when she tried to make complaints about the hostility. When Askar requested a day shift to remedy the harassment, Allen refused.

3.35.    When Askar interviewed she informed Allen and Ault that she would need Friday days off as a religious accommodation because it was her holy day.

3.36.    Allen perpetrated religious discrimination repeatedly when she would schedule mandatory meetings with Askar when she was not scheduled, requiring her to come into work, during prayer time, and on her off days.

3.37.    On January 5th, 2024, Allen called Askar into her office for an unscheduled reprimand meeting where she falsely accused Askar of not calling into work on December 26, 2024, which was pretext for writing Askar up. Askar quickly provided proof that she received a phone call from the charge nurse's unit mobile, and her shift was canceled for the night. Allen said she would investigate, but that was never done.

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

3.38.    During that meeting Askar became emotional, and explained to Allen that the allegations were false, and that she was additionally upset by the events in Palestine where her family lives. Allen screamed at Askar, "You are an American Maha! You came from Hawaii." Allen yelled loud enough to draw the attention of numerous staff members outside of the closed-door office, and reducing Askar to tears. Askar responded that she was a Palestinian from Texas, and she was impacted by the conflict. Allen rolled her eyes and shrugged her shoulders.

3.39.    During that same meeting, Askar again complained to Allen that she was being mistreated by multiple staff members who refused to assist her with basic requirements of the job, and coworkers refused to speak to her, and numerous staff members were refusing to relieve Askar so she could take her prayer breaks when she requested them and needed them. After reporting Curtis' behavior Allen said she was not surprised by Curtis' actions and stated that she would not reprimand Curtis. Allen stated that she knew everything that happened in the unit, indicating that she was knowledgeable about the hostility that Askar experienced.

3.40.    On January 10, 2024, Allen summoned Askar to her office again for another unscheduled reprimand meeting, where Allen presented Askar with a pretextual reprimand and to notify Askar her probation was being extended.

3.41.    The reprimand was for December 26th, 2023, when Askar was called by the charge nurse and she confirmed her shift was canceled, a situation they previously discussed, and Allen said she would investigate. Instead of verifying with staff, Allen used it to pretextually discipline Askar by presenting her with probationary extension documents several days prior to her probationary release and becoming a permanent staff member of Providence-Swedish Medical facility.

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

3.42.    The Collective Bargaining Agreement requires that staff have notice of all reprimand meetings so they can bring a witness or union delegate. Askar was never given notice of Allen's reprimand meetings.

3.43.    On or around January 13, 2024, Askar informed Ronco Wong, the union representative, that she was experiencing ongoing harassment, discrimination, and hostility from Allen and that her probationary period was being extended without cause. Wong explained to Askar that "Laura has been in hot waters before," and he could not help until Askar was off probation.

3.44.    On or around January 25, 2024, Askar emailed Laura Allen, Danielle Curtis and Braden Allen reporting the hostile work environment and staffs' refusal to assist her with patient care, and that she was never assigned a locker and staff had gone through her belongings. She never received a response.

3.45.    On or around January 30, 2024, Askar reported to Care Relations about the ongoing harassment and retaliation she experienced. That same day, she emailed Dana Kyles, the Unit Director, reporting the ongoing harassment and retaliation, and Kyles said she forwarded the email to Elina Lazo, the Chief Nursing Officer. Allen then emailed Askar demanding she attend a mandatory meeting with Human Resources on Friday at 7:30 am, which conflicted with her prayer time. Askar, again called Care Relations, to report that Allen refuses to provide religious accommodations for meetings.

3.46.    On or around February 4, 2024, Askar was notified that her shift was cancelled for being overstaffed. This was after Allen had transferred two-night nurses to day shift because of over staffing. Also, Askar had requested to be transferred to day shift to remedy the harassment and she was denied.

11

3.47.    Then on or around February 5th, 2024, Askar went to work and discovered a new employee, Mackenzie Frost, was a new hire who was being trained as a triage nurse. Previously, Allen told Askar she could not train to be a triage nurse because she was on probation, however Frost was hired and immediately in training for triage.  Askar was more qualified than Frost, and she had more seniority than Frost.

3.48.    Askar is a very experienced triage nurse and more experienced than many nurses on the ward, which Allen knew about prior to hiring her. Typically, the more experienced labor and delivery nurse is assigned as the triage nurse, and Askar informed Allen that the triage nurse position would accommodate her prayer schedule, so she was hopeful to be trained in triage when her probation ended on or around January 14, 2024. Instead, Askar's probation was extended, and Frost was trained as triage even though she was less experience and had less seniority.

3.49.    On or around February 7, 2024, Askar met with Laura Allen, the unit manager, Laura Anna, her union delegate, and Lorrie Ward, a Providence-Swedish HR specialist, in a virtual meeting. During the meeting Allen and Ward both had their cameras off. Allen falsely accused Askar that numerous staff members made reports against her, and that staff members feared her because she spoke a different language. Askar refuted the allegations and reiterated the hostile work environment and retaliation she experienced. After the meeting Anna encouraged Askar to resign stating, "Laura will continue to harass and micromanager you until she can find a reason to terminate you, and that will cause you to be ineligible to work for Providence anywhere in the US." Askar was forced to resign after her union representative warned her that management planned to fire her. These actions created an intolerable work environment, making it nearly impossible for her to perform her duties safely and effectively.

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

3.50.    On or around February 8, 2024, Askar was constructively discharged from her position. She submitted a resignation letter with her final day as February 22, 2024, but Allen emailed her demanding Askar not return to the hospital, and her final day would be February 8th, 2024. Lazo then emailed Askar stating, "I'm sorry this situation drove you to resign from your position."

3.51.    On March 11, 2024, Askar was contacted by a Care Relations Specialist who informed Askar that an investigation was complete, but the information was confidential.

3.52.    The Defendants failed to compensate Askar for her first six weeks of her employment as they sent the paychecks to Hawaii, at her previous address, but Askar was working and living in Washington.

3.53.    When Askar brought this to Swedish Edmonds attention it took weeks to remedy, and she was never provided a full accounting of her shifts and her compensation. Askar believes she was not paid for multiple shifts.

3.54.    Also, Defendants required Askar to have meetings with Ault and Allen without compensation as she had clocked out of work and on her way out of the hospital when she was told she must go to a meeting. She was never compensated for the meetings.

3.55.    Askar was forced to miss her rest and meal breaks on multiple occasions and she was unable to pray during her designated prayer times.

## I.    FIRST CAUSE OF ACTION
### Violation of Washington Law Against Discrimination,
### Chapter 49.60 RCW, for Race Discrimination

3.56.    Plaintiff realleges above paragraphs 1.1 though 3.55.

3.57.    The acts and conduct of defendant as alleged herein constitute race discrimination by denying her a day shift, extending her probationary period, and forcing her to resign because she was an Arab American.

3.58.    As a result of the unlawful acts of defendant, plaintiff has been injured in an amount to be proven at trial; and is entitled to recover all damages sustained including but not limited to past and future, actual and compensatory, economic and non-economic, and special and general damages.

**IV.    SECOND CAUSE OF ACTION**
**Violation of Title VII of the Civil Rights Act Chapter 42 U.S.C. § 1981(a),**
**Race and National Origin Discrimination**

4.1.    Plaintiff realleges above paragraphs 1.1 though 3.55.

4.2.    The acts and conduct of defendant as alleged herein constitute race and national origin discrimination as described above including, by denying her a day shift, extending her probationary period, and forcing her to resign because she was an Arab American.

4.3.    As a result of the unlawful acts of defendant, plaintiff has been injured in an amount to be proven at trial; and is entitled to recover all damages sustained including but not limited to past and future, actual and compensatory, economic and non-economic, and special and general damages.

**V.    THIRD CAUSE OF ACTION**
**Violation of Washington Law Against Discrimination,**
**Chapter 49.60 RCW, for Religious Discrimination Failure to Accommodate**

5.1.    Plaintiff realleges above paragraphs 1.1 though 3.55.

5.2.    The acts and conduct of defendant as alleged herein constitute failure to accommodate the Plaintiff's religious accommodations by not allowing her to pray at specific prayer times, and planning and mandating the Plaintiff to attend meetings during her holy day.

14

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

5.3.    As a result of the unlawful acts of defendant, plaintiff has been injured in an amount to be proven at trial; and is entitled to recover all damages sustained including but not limited to past and future, actual and compensatory, economic and non-economic, and special and general damages.

## VI.        FOURTH CAUSE OF ACTION
### Violation of Title VII of the Civil Rights Act Chapter 42 U.S.C. § 2000e-2, Religious Discrimination for Failure to Accommodate

6.1.    Plaintiff realleges above paragraphs 1.1 though 3.55.

6.2.    The acts and conduct of defendant as alleged herein constitute failure to accommodate the Plaintiff's religious accommodations by not allowing her to pray at specific prayer times, and planning and mandating the Plaintiff to attend meetings during her holy day.

6.3.    As a result of the unlawful acts of defendant, plaintiff has been injured in an amount to be proven at trial; and is entitled to recover all damages sustained including but not limited to past and future, actual and compensatory, economic and non-economic, and special and general damages.

## VII.        FIFTH CAUSE OF ACTION
### Violation of Washington Law Against Discrimination, Chapter 49.60 RCW, for National Origin Discrimination

7.1.    Plaintiff realleges above paragraphs 1.1 though 3.55.

7.2.    The acts and conduct of defendant as alleged herein constitute discrimination against the Plaintiff based on her Palestinian national origin. Defendants failed to stop harassment, and discrimination based on the Plaintiff's national origin.

7.3.    As a result of the unlawful acts of defendant, plaintiff has been injured in an amount to be proven at trial; and is entitled to recover all damages sustained including but not

15

limited to past and future, actual and compensatory, economic and non-economic, and special and general damages.

**VIII.      SIXTH CAUSE OF ACTION**
**Violation of Title VII of the Civil Rights Act Chapter 42 U.S.C. § 1981,**
**Hostile Work Environment**

8.1.    Plaintiff realleges above paragraphs 1.1 though 3.55.

8.2.    The acts and conduct of defendant as alleged herein constitute a hostile work environment based on the Plaintiff's race and national origin. The Defendants knew the Plaintiff was experiencing harassment based on her religious beliefs and they failed to stop the harassment.

8.3.    As a result of the unlawful acts of defendant, plaintiff has been injured in an amount to be proven at trial; and is entitled to recover all damages sustained including but not limited to past and future, actual and compensatory, economic and non-economic, and special and general damages.

**IX.      SEVENTH CAUSE OF ACTION**
**Violation of Washington Law Against Discrimination,**
**Chapter 49.60 RCW, for Hostile Work Environment**

9.1.    Plaintiff realleges above paragraphs 1.1 though 3.55.

9.2.    The acts and conduct of defendant as alleged herein constitute a hostile work environment based on the Plaintiff's protected status. The Defendants knew the Plaintiff was experiencing harassment based on her protected status and they failed to stop the harassment.

9.3.    As a result of the unlawful acts of defendant, plaintiff has been injured in an amount to be proven at trial; and is entitled to recover all damages sustained including but not limited to past and future, actual and compensatory, economic and non-economic, and special and general damages.

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

## X.    EIGHTH CAUSE OF ACTION
### Violation of Washington Law Against Discrimination, Wrongful Termination - Constructive Discharge

10.1.    Plaintiff realleges above paragraphs 1.1 though 3.55.

10.2.    The acts and conduct of defendant as alleged herein constitute wrongful termination as the Defendant's actions caused an end to Plaintiff's employment, constituting wrongful termination in violation of public policy. The ** Plaintiff was informed she needed to quit, or she would continue to face harassment and discrimination, leading to termination and ineligibility to work for Providence Medical Corporation.

10.3.    As a result of the unlawful acts of defendant, plaintiff has been injured in an amount to be proven at trial; and is entitled to recover all damages sustained including but not limited to past and future, actual and compensatory, economic and non-economic, and special and general damages.

## XI.    NINTH CAUSE OF ACTION
### Violation of the Washington Industrial Welfare Act and Violation of the Washington Minimum Wage Act Chapter 49.12 RCW, Failure to Provide Meal Period and Failure to Compensate for Violations of Meal Period

11.1.    Plaintiff realleges above paragraphs 1.1 though 3.55.

11.2.    The Washington Industrial Welfare Act, RCW 49.12, and its implementing regulation, WAC 296-126-092, require employers to provide a meal period of not less than thirty minutes, on the employer's time, for each five hours of working time.

11.3.    Employees have an implied cause of action for violations of RCW 49.12 to protect them from conditions of labor that have a pernicious effect on their health. *Wingert v. Yellow Freight Systems, Inc.*, 146 Wn.2d 841, 850 (2002).

17

11.4.    A meal period violation is a wage violation with employees entitled to thirty minutes of additional compensation for each instance they are required to work more than five consecutive hours without a compliant meal period. *Hill v. Garda CL Nw., Inc.*, 191 Wn.2d 553, 560 (2018), citing *Hill v. Garda CL Nw., Inc.*, 198 Wn. App 326, 361 (2017).

11.5.    Defendant violated the Minimum Wage Act when it failed to compensate Plaintiff for thirty minutes of work for each a meal period in a duration of thirty minutes commencing between the second and fifth hour from the start of their shift, or when it required them to work greater than five consecutive hours without or between meal periods.

11.6.    As a result of the unlawful acts of defendant, plaintiff has been injured in an amount to be proven at trial; and is entitled to recover all damages sustained including but not limited to past and future, actual and compensatory, economic and non-economic, and special and general damages.

**XII.    TENTH CAUSE OF ACTION**
**Violation of the Washington Industrial Welfare Act and Violation of the**
**Washington Minimum Wage Act Chapter 49.12 RCW, Failure to Provide Rest**
**Period and Failure to Compensate for Missed Rest Periods**

12.1.    Plaintiff realleges above paragraphs 1.1 though 3.55.

12.2.    The Washington Industrial Welfare Act, RCW 49.12, and its implementing regulation, WAC 296-126-092, require employers to provide a rest period of not less than ten minutes, on the employer's time, for each four hours of working time.

12.3.    Employees have an implied cause of action for violations of RCW 49.12 to protect them from conditions of labor that have a pernicious effect on their health. *Wingert v. Yellow Freight Systems, Inc.*, 146 Wn.2d 841, 850 (2002).

12.4.   A rest period violation is a wage violation with employees entitled to ten minutes of additional compensation for each instance they are required or allowed to work longer than three consecutive hours without a rest break. *Id* at 849.

12.5.   Defendant violated the Industrial Welfare Act and its implementing regulation by failing to ensure Plaintiff received a ten-minute paid rest period for every four hours worked and by failing to keep records of the occurrence, time and duration of rest periods taken, by failing to implement a process for Plaintiffs and members of the putative class to report missed or otherwise noncompliant rest periods and by creating work schedules, staffing levels and conditions of work that discouraged paid rest periods.

12.6.   Defendant violated the Minimum Wage Act when it failed to compensate Plaintiff for an additional ten minutes of work for each instance it required them to work greater than three consecutive hours without a rest period, provided a rest period in a duration of less than ten minutes, or did not provide a rest period of at least ten minutes in duration for each four hours worked.

12.7.   Defendant violated the Industrial Welfare Act, the Minimum Wage Act when they failed to compensate Plaintiff for rest periods separately and in addition to piecework, commission, and/or other productivity-based wages.

12.8.   As a result of the unlawful acts of defendant, plaintiff has been injured in an amount to be proven at trial; and is entitled to recover all damages sustained including but not limited to past and future, actual and compensatory, economic and non-economic, and special and general damages.

MX Law
Phone (253) 693-0388
morgan@mxlaw.net

### XIII.     ELEVENTH CAUSE OF ACTION
**Violation of the Washington Wage Rebate Act**
**Willful Withholding of Wages in**

13.1.    Plaintiff realleges above paragraphs 1.1 though 3.55.

13.2.    By the foregoing, Defendant's actions constitute willful withholding of wages due in violation of RCW 49.52.050 and 070.

13.3.    As a result of the unlawful acts of defendant, plaintiff has been injured in an amount to be proven at trial; and is entitled to recover all damages sustained including but not limited to past and future, actual and compensatory, economic and non-economic, and special and general damages.


### XIV.          REQUEST FOR RELIEF

14.1.    Awarding Plaintiff back pay and lost wages, loss of career trajectory and income potential, and lost benefits to be proven at trial;

14.2.     Awarding Plaintiff general damages for loss of enjoyment of life, pain and suffering, mental anguish, emotional distress, injury to reputation, and humiliation;

14.3.    Awarding Plaintiff reasonable attorney's fees and costs;

14.4.    Awarding Plaintiff pre-judgement interest in an amount to be proven at trial;

14.5.    Awarding Plaintiff post-judgement interest in an amount to be proven at trial;

14.6.    Awarding Plaintiff an offset for the adverse tax consequences of the judgment;

14.7.    Declaratory and injunctive relief;

14.8.    Leave to amend the Complaint to conform to the evidence presented at trial; and

14.9.    Further and additional relief that the court deems just and equitable.

20

DATED this 2nd day of March, 2026.

MX Law, PLLC

*s/Morgan Mentzer*

Morgan Mentzer, WSBA No. 47483
710 Pacific Ave, #8
Tacoma, WA 98402
(253) 693-0388
morgan@mxlaw.net
*Attorney for Plaintiff*